**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Michele Stewart, | : |
|     *Plaintiff*, | : |
| | :    Civil Action No. 25-cv-9326 |
| v. | : |
| | :    **Jury Trial Demanded** |
| Benjamin Black, | : |
|     *Defendant*. | : |

## COMPLAINT

### I. PRELIMINARY STATEMENT

1. This is an action brought to recover fraudulent transfers made from EasyKnock Inc. to Defendant Benjamin Black that defrauded claimants like Plaintiff Michele Stewart of hundreds of thousands of dollars owed to them by the now defunct company.

2. Prior to "closing its doors" in November 2024, EasyKnock Inc. operated, from its headquarters in Manhattan, a sophisticated home-equity-theft business which purchased victims' homes for fractions of their value along with illusory promises of unrealizable repurchase options.

3. The fraudulent nature of EasyKnock's scheme did not go unnoticed, giving rise to around 50 lawsuits nationwide, brought by both consumers and state attorneys general. Plaintiff Michele Stewart is one of those consumers, having filed a lawsuit in August 2024 against EasyKnock, alleging violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") related to a "sale-leaseback" transaction. Complaint, *Stewart v. EasyKnock, Inc.*, No. 24-cv-

3704, Doc. No. 1 (E.D. Pa. Aug. 2, 2024) (hereinafter the "Consumer Protection Lawsuit").

4. Rather than face the growing chorus of its consumer creditors, Jarred Kessler—CEO, co-founder, and owner of EasyKnock—and Defendant Benjamin Black—co-founder and owner of EasyKnock—instead conspired to strip EasyKnock of all its remaining assets, including the homes purchased from the consumer-victims, and leave EasyKnock a shell of itself, neither able to be collected against nor even participate in the substantial on-going litigation.

5. Soon thereafter, around late November 2024, EasyKnock was abruptly reduced from a functioning business to a single, text-only webpage, stating that "EasyKnock has closed its doors" and that "arrangements have been made to ensure continued services for our customers."[1]

6. No details were provided about said arrangements. Its offices were left empty. And it did not respond to requests for comment from news outlets such as NPR.[2] As Senator Elizabeth Warren suggested, in a letter to CEO Jarred Kessler requesting information shortly after EasyKnock's closure: "EasyKnock's decision to 'shut down' raises even more questions about how it will handle ongoing agreements and properly compensate homeowners who were negatively affected by

---

[1] https://easyknock.com/ (*retrieved on* July 29, 2025).

[2] *See* Caitlin Thompson, "A company that turned homeowners into renters abruptly shuts down," NPR (Dec. 6, 2024), https://www.npr.org/2024/12/06/nx-s1-5218625/sale-leaseback-rent-mortgage-easyknock.

...
...

the company's actions."[3]  Even its lawyers were left in the dark as it completely ceased participating in ongoing litigation against it.

    7.    In Plaintiff Michele Stewart's case, EasyKnock abruptly stopped communicating with its attorney and ceased any involvement in the litigation against it. As a direct result of EasyKnock's absconding from the litigation, on July 21, 2025, Chief Judge Goldberg of the Eastern District of Pennsylvania, granted a default judgment against EasyKnock and in favor of Ms. Stewart in the amount of $352,666.20 plus post-judgment interest. The order and opinion are attached hereto as Exhibit A.

    8.    Plaintiff Michele Stewart now brings this action to collect on that $352,666.20 judgment against Defendant Benjamin Black, whose transfers from EasyKnock were actually or constructively fraudulent under New York's Uniform Voidable Transactions Act, N.Y. Debt. & Cred. Law §§ 270–281-a (hereinafter "UVTA" and "NY DCL"), as they were made in order to hinder, delay or defraud creditors; they were made without receiving equivalent value; and they caused or took place after the insolvency of EasyKnock.

## II. PARTIES, JURISDICTION, AND VENUE

    9.    Plaintiff Michele Stewart is an adult Pennsylvania citizen who resides in Philadelphia with her two children.

---

[3] Letter from Sen. Elizabeth Warren *et al.* to Jarred Kessler, CEO of EasyKnock (Dec. 16, 2024), https://www.warren.senate.gov/imo/media/doc/letter_to_easyknock_re_business_practices.pdf.

10. Debtor EasyKnock, Inc. is incorporated in Delaware with its former principal place of business at 111 W. 33rd Street, Suite 1901, New York, New York 10120.

11. Defendant Benjamin Black is a co-founder of EasyKnock, owner of EasyKnock, and the current owner or constructive owner of all of EasyKnock's former real estate properties. On information and belief, he resides in New York State.

12. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because this action is brought between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. At all times relevant to this lawsuit, Defendant purposefully availed himself of the business and economic opportunities within New York and carried on continuous and systematic parts of their business in New York. Defendant resides in New York. This Court can therefore exercise personal jurisdiction over Defendant.

13. All events, incidents, and circumstances relevant to this lawsuit took place in the Southern District of New York; therefore, venue is proper in this district.

### III. FACTUAL ALLEGATIONS

#### A. Facts Concerning the Claim of Plaintiff Michele Stewart

14. Plaintiff Michele Stewart filed a lawsuit in the United States District Court of the Eastern District of Pennsylvania against EasyKnock Inc., EasyKnock's CEO Jarred Kessler, and the property holding company EK Real Estate Fund I on

4

August 2, 2024. Complaint, *Stewart v. EasyKnock, Inc.*, No. 24-cv-3704, Doc. No. 1 (E.D. Pa. Aug. 2, 2024).

15.     In the lawsuit, she alleged that defendants violated Pennsylvania's UTPCPL related to a "sale-leaseback" transaction whereby EasyKnock purchased Ms. Stewart's $189,000 home for $71,444.60 and then leased it back to her.

16.     In the *ad damnum*, Ms. Stewart requested over $100,000 in actual damages, along with trebled damages pursuant to the Pennsylvania UTPCPL, as well as attorneys' fees and costs.

17.     Initially, a single attorney from the law firm Barnes & Thornburg LLP entered an appearance in the Eastern District of Pennsylvania on behalf of all three defendants, including EasyKnock Inc., in late August.

18.     In late September, counsel for Ms. Stewart and for the defendants agreed to arbitrate the dispute and stay the federal court proceedings.

19.     On November 18, EasyKnock terminated Barnes & Thornburg LLP as counsel. No substitute counsel was identified or ever would be.

20.     When EasyKnock had still not obtained counsel as of the parties' December 30, 2024 report to the court, Judge Goldberg ordered EasyKnock to obtain counsel within two weeks.

21.     When EasyKnock still had not obtained counsel by the end of February, Judge Goldberg terminated the stay as to EasyKnock and on March 6, entered a default at Ms. Stewart's request.

22.   On March 14, Ms. Stewart promptly moved for default judgment, which Judge Goldberg granted on July 21. A copy of the opinion and judgment is attached to this Complaint as Exhibit A.

23.   Judge Goldberg found that that:

> EasyKnock deceived Plaintiff, an unsophisticated consumer searching for a home equity loan, into signing a dense and sophisticated agreement which resulted in Plaintiff giving up title to her home. EasyKnock misled Plaintiff as it relates to the characteristics, uses, benefits, and cost of the sale-leaseback product by inter alia: (1) "marketing a product that they know is not a loan to financially unsophisticated consumers searching for a home equity loan"; (2) likening its sale-leaseback product to a home equity loan; (3) concealing from Plaintiff the fact that she would immediately give up title to her home; (4) failing to obtain a rental license or provide the mandatory disclosures to tenants required of landlords; (5) collecting "rent" in an amount that more closely resembles a mortgage payment, rather than a rental payment; (6) exaggerating the likelihood that future resale will benefit Plaintiff; (7) imposing charges against Plaintiff's home equity for repairs that were never made.

Opinion at ¶ 14, and that these facts made out Plaintiff's claim under the Pennsylvania UTPCPL.

24.   Judge Goldberg further found that Ms. Stewart was entitled to the trebled damages provision of that law, "because EasyKnock has not, in anyway, responded to this litigation and thus, admits to the outrageous and deceptive conduct outlined above and in Plaintiff's Complaint." Opinion at ¶ 17.

25.   In total, the court awarded Ms. Stewart $352,666.20 plus post-judgment interest from the date of the order.

26.   In her briefing, despite being entitled to seek "costs and reasonable attorneys' fees" under the law at 73 P.S. § 201-9.2, Plaintiff declined to do so "in

6

[that] action, but so doing [did] not intend … to waive her right to seek such fees in any collection actions that follow[ed] upon [that] judgment."

### B. Facts Concerning Other Creditors

27. Ms. Stewart is not the only creditor with a claim against EasyKnock.

28. There have been around 50 court proceedings filed against EasyKnock by consumers that seek compensation for EasyKnock's deceptive acts and practices, along with an unknown number of arbitration proceedings.

29. Moreover, EasyKnock's deceptive practices became a major concern for state attorneys general enforcing consumer protection laws nationwide.

30. On December 5, 2023, the Attorney General of Massachusetts announced an "assurance of discontinuance" settlement with EasyKnock, regarding the company's "unfair and deceptive acts and practices in the process of marketing sale-leaseback products and transacting with Massachusetts consumers." The company agreed not to solicit or enter into a sale-leaseback transaction on any residential property in Massachusetts in perpetuity, to adjust tenants' monthly rent amounts, to return certain withheld funds, to revise its form lease agreement and to pay $200,000 to the state. See https://www.mass.gov/news/ag-campbell-reaches-settlement-with-real-estate-company-easyknock-to-resolve-allegations-of-unfair-and-deceptive-conduct.

31. On May 22, 2024, the Attorney General of Michigan announced that it was proceeding against EasyKnock, seeking a cease-and-desist order, regarding the company's targeting of "financially distressed homeowners with low credit and high home equity," for unlawful sale-leaseback transactions.

7

32. On February 29, 2024, the Commissioner of Consumer Protection of Connecticut, in cooperation with the Attorney General of Connecticut, opened an investigation into EasyKnock's practices, issuing a Civil Investigation Demand directed to EasyKnock seeking answers to interrogatories and documentary material "in connection with an investigation into business practices regarding residential sale-leaseback agreements which may constitute unfair or deceptive acts or practices in violation of [the Connecticut Unfair Trade Practices Act.]" *See* https://portal.ct.gov/-/media/ag/press_releases/2024/2024-02-15-easyknock-cid.pdf.

33. The State of Connecticut would finally file suit around the same time that EasyKnock ceased operations in November 2024. *See* Complaint, *Connecticut v. EasyKnock Inc.*, No. HHD-CV-24-6195162-S, Doc. No. 100.30 (Conn. Super. Ct. Nov. 27, 2024). Connecticut was granted a default judgment in March 2025 after EasyKnock failed to appear after being lawfully served. *Id.* at Doc. No. 107.00 (motion); Doc. No. 107.86 (order).

34. Finally, even after EasyKnock ceased operations, public pressure remained on Jarred Kessler, its CEO, to account for EasyKnock's deceptive practices and victimization of consumers, particularly in light of its sudden disappearance.

35. On December 16, 2024, Sen. Elizabeth Warren authored a letter along with six of her colleagues, addressed to Mr. Kessler and demanding information and

documents related to EasyKnock's practices as well as information about how EasyKnock would make customers whole following its disappearance.[4]

36.　　No purported response to that letter by Mr. Kessler was ever made available publicly.

### C. Facts Concerning the Fraudulent Transactions

37.　　Of course, EasyKnock's cessation of business and disappearance from the scene is neither innocent nor a mystery. And, most notably, it did not take place in a void.

38.　　In order to avoid mounting liabilities for consumers and regulators seeking compensation for EasyKnock's illegal practices, EasyKnock's co-founders and owners stripped EasyKnock of its most valuable assets: the substantial number of residential properties it had obtained from customers through its deceptive "sales-leaseback" product.

39.　　Although EasyKnock provided all operational and managerial functions necessary to the "sales-leaseback" scheme—including, for instance, marketing, sales, and property management—it utilized wholly-owned subsidiaries to actually purchase the properties.

40.　　Those wholly-owned subsidiaries included, among other entities, EK Real Estate Fund I, CTI 1379 LLC, and BTI 1179.

---

[4] Letter from Sen. Elizabeth Warren *et al.* to Jarred Kessler, CEO of EasyKnock (Dec. 16, 2024), https://www.warren.senate.gov/imo/media/doc/letter_to_easyknock_re_business_practices.pdf.

41. EK Real Estate Fund I owns over 100 single family homes across the country, among those is the home purchased from Ms. Stewart through the deceptive "sale-leaseback" deal.

42. CTI 1379 LLC owns over 100 single family homes across the country.

43. BTI 1179 LLC owns over 100 single family homes across the country.

44. Jarred Kessler and Defendant Benjamin Black co-founded EasyKnock in or about August 2016 as a "proptech" startup—that is, a startup that attempts to apply new technologies to the real property industry.

45. Kessler held the role of Chief Executive Officer, and Defendant Black held the role of Chief Information Officer.

46. Both Kessler and Defendant Black also held ownership stakes in the company.

47. Over the next several years, Kessler and Defendant Black raised hundreds of millions of dollars for EasyKnock in both debt and equity in order to finance the substantial amounts of capital needed to fund the "sale-leaseback" scheme on a national scale.

48. Sometime in or around 2021, Defendant Black left his officer role at the company but maintained his ownership interests.

49. Sometime in or around 2024, as the lawsuits were mounting, Kessler and Defendant Black agreed upon a scheme to strip EasyKnock of its assets to shield those assets from consumer creditors.

50. They intended to shield those assets to the advantage of themselves personally and to the advantage of other Wall Street investors and lenders with whom Kessler and Defendant Black hoped to maintain their reputations going forward.

51. In execution, the asset-stripping operation was rather simple: EasyKnock sold all of its wholly-owned subsidiaries which were used to purchase and hold the consumers' homes to Defendant Black or companies directly controlled by him.

52. The subsidiaries so transferred included EK Real Estate Fund I, CTI 1379 LLC, and BTI 1179 LLC, each with over 100 properties to its name, as well as all other entities holding property previously controlled by EasyKnock.

53. In return, EasyKnock did **not** receive the tens of millions of dollars, if not hundreds of millions of dollars, that this nationwide portfolio of single-family homes was worth.

54. Any remaining cash assets of EasyKnock—including any token consideration received for the "sale" of the property-holding subsidiaries—were either used to wind-down the company or to pay out equity investors or non-consumer creditors.

55. The "sale" of the property-holding subsidiaries and the transfer of any remaining cash assets was finalized in or around November 2024.

56. Prior to the transfers in November 2024, EasyKnock had already begun to winddown its operations.

57. For instance, as early as August 8, 2024, EasyKnock was no longer occupying 111 W. 33rd St, Ste. 1901, New York, NY, which is still reported to the New York Secretary of State as its principal place of business.

58. EasyKnock's inability to maintain an operational business address suggests cash flow problems and that it was teetering on the edge of insolvency, even at the time that Ms. Stewart filed her lawsuit.

59. Despite EasyKnock putting out press releases and seeking media attention related to its founding and its startup funding rounds, these transfers were not publicized or at any time announced and there has been no public accountability or transparency about the transfers.

60. Indeed, the only public "announcement" that was made about EasyKnock ceasing operations at all is a single paragraph posted to EasyKnock's now otherwise empty website, which simply stated:

> After many years of serving consumers, EasyKnock has closed its doors. We are deeply grateful for the trust placed in us to be part of the financial journey of so many. While EasyKnock may no longer be around, arrangements have been made to ensure continued services for our customers.

61. As NPR explained, "Neither the statement on EasyKnock's website, nor notices sent to current clients, explained the cause of the company's sudden closure. EasyKnock did not respond to NPR's request for comment."[5]

---

[5] *See* Caitlin Thompson, "A company that turned homeowners into renters abruptly shuts down," NPR (Dec. 6, 2024), https://www.npr.org/2024/12/06/nx-s1-5218625/sale-leaseback-rent-mortgage-easyknock.

62. As would be expected, EasyKnock's disappearance has hindered, delayed, or defrauded creditors, including Ms. Stewart and other consumers who have brought lawsuits against EasyKnock.

63. In Ms. Stewart's case, EasyKnock's disappearance and insolvency has hindered, delayed, and defrauded her ability to enforce her Claim, which has now been reduced to a final and enforceable judgment against EasyKnock.

64. Indeed, EasyKnock's intentional decision to permit a default to be entered against it, despite being represented by counsel at the outset of the litigation, reflects in itself an intent to hinder, delay, or defraud Ms. Stewart insofar as it reflects EasyKnock's intention to disappear from the scene and make collection against it impossible.

65. Letters requesting payment of the judgment sent to EasyKnock's principal place of business, its address for service filed with the New York Secretary of State, and its address for service filed with the Delaware Secretary of State—where it is incorporated—were sent on August 11, 2025 and received between August 14 and August 18, none of which have been answered.

66. At the same time, Plaintiff's counsel also emailed the letters to CEO Jarred Kessler's counsel in the yet-to-be-commenced arbitration, and Mr. Kessler—who is the only remaining known officer of the company—has refused to respond or recognize the judgment on behalf of EasyKnock.

67. Further, because EasyKnock has transferred all of its property-holding subsidiaries, there is no real property against which Ms. Stewart might assert a lien in order to collect or enforce her judgment.

68. Indeed, in light of EasyKnock's complete absconding from its obligations in the litigation brought by Ms. Stewart along with the facts regarding its closure and cessation of operations, EasyKnock does not appear to have any continuing existence or assets that might be collected against.

69. EasyKnock's disappearance following the transfers has therefore delayed, hindered, or defrauded Ms. Stewart's ability to enforce her claim by effectively making it impossible to collect.

70. Furthermore, EasyKnock's disappearance has even delayed the arbitration, where neither Mr. Kessler nor EasyKnock ever informed the arbitrator about the status of EasyKnock, leading the arbitration only being commenced a few weeks ago, nearly a year after the initial filing.

71. Moreover, EasyKnock's disappearance is likely to create concrete obstacles to Ms. Stewart in advancing and proving her claims in the still outstanding arbitration against EK Real Estate and Mr. Kessler by hindering access to documents and communications relevant to consumer creditors' claims—including marketing scripts and policies, recordings of calls, and other documents relevant to deceptive consumer transactions—which would have been in the possession of the EasyKnock entity.

72. Despite a request made in December of 2024 that attorneys for EK Real Estate and Mr. Kessler investigate the control and preservation of documents relevant to Ms. Stewart's claim following the closure of EasyKnock, those attorneys have thus far provided no confirmation that any and all such relevant documents were preserved.

IV. **CLAIMS FOR RELIEF**

### Count I
### Actual Fraudulent Transfer, NY DCL § 273

73. The above allegations are re-averred and incorporated by this reference.

74. Plaintiff Michele Stewart is a Creditor under NY DCL § 270(d) and her Consumer Protection Lawsuit is a Claim under the UTVA because it is a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured under NY DCL § 270(c).

75. EasyKnock is a Debtor because it is liable on Plaintiff Stewart's Claim. NY DCL § 270(f).

76. EasyKnock transferred significant assets of value—including all real estate properties, liens on real estate properties, and subsidiary companies that held such interests in real estate properties—sometime around November 2024, after Plaintiff Stewart's Consumer Protection Lawsuit was filed.

77. Equivalent value was not received by Debtor EasyKnock from Defendant Black for these transfers.

78. At the time of the transfers, a significant number of consumer protection lawsuits and attorney general consumer protection enforcement actions had been filed or undertaken against Debtor EasyKnock, which gave rise to other creditor claims against EasyKnock.

79. EasyKnock made these transfers with actual intent to hinder, delay or defraud Plaintiff Stewart and similar creditors both by making it impossible to collect against EasyKnock related to these claims and by increasing discovery burdens on creditors attempting to enforce those claims through litigation.

80. Following these transfers, Debtor EasyKnock ceased doing business and ceased participating in litigation against it, including litigation brought by Plaintiff Stewart.

81. These transfers bear a significant number of badges of fraud both recognized in New York law and specifically in NY DCL § 273(b) including:

   a. Defendant Black was a co-founder of Debtor EasyKnock and therefore had a close relationship with Debtor EasyKnock and CEO Kessler;

   b. Defendant Black knew or should have known that Debtor EasyKnock was engaging in the transfer in order to delay, hinder, or defraud creditors such as Plaintiff Stewart.

   c. The consideration for the transfer was inadequate;

    d. Debtor EasyKnock was fully apprised of Plaintiff Stewart's Claim and its inability to pay it if it transferred all its real property interests to Defendant Black;

    e. The transfer to Defendant Black was disclosed or concealed;

    f. Debtor EasyKnock had been sued by tens of consumer victims prior to the transfer;

    g. The transfer was of substantially all of Debtor EasyKnock's assets;

    h. Debtor EasyKnock absconded and disappeared;

    i. Debtor EasyKnock was insolvent or became insolvent shortly after the transfer was made.

82. The transfers to Defendant Black by Debtor EasyKnock are therefore voidable transfers pursuant to NY DCL § 276(a)(1), and Plaintiff is entitled to a judgment against Defendant Black for the value of her Claim pursuant to NY DCL § 277(b)(1).

83. Plaintiff is also entitled to attorneys' fees pursuant to NY DCL § 276-a because such fees were available to prevailing parties pursuant 73 P.S. § 201-9.2, the statute under which her underlying claim arose.

### Count II
### Constructive Fraudulent Transfer, NY DCL § 274

84. The above allegations are re-averred and incorporated by this reference.

85. Plaintiff Michele Stewart is a Creditor under NY DCL § 270(d) and her Consumer Protection Lawsuit is a Claim under the UTVA because it is a right to

payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured under NY DCL § 270(c).

86. EasyKnock is a Debtor because it is liable on Plaintiff Stewart's Claim. NY DCL § 270(f).

87. EasyKnock transferred significant assets of value—including all real estate properties, liens on real estate properties, and subsidiary companies that held such interests in real estate properties—sometime around November 2024 after Plaintiff Stewart's Consumer Protection Lawsuit was filed.

88. Equivalent value was not received by Debtor EasyKnock from Defendant Black for these transfers.

89. Following these transfers, Debtor EasyKnock ceased doing business and ceased participating in litigation against it, including litigation brought by Plaintiff Stewart, and therefore was insolvent or became insolvent as a result of the transfers.

90. The transfers to Defendant Black by Debtor EasyKnock are therefore voidable transfers pursuant to NY DCL § 276(a)(1), and Plaintiff is entitled to a judgment against Defendant Black for the value of her Claim pursuant to NY DCL § 277(b)(1).

91. Plaintiff is also entitled to attorneys' fees pursuant to NY DCL § 276-a because such fees were available to prevailing parties pursuant 73 P.S. § 201-9.2, the statute under which her underlying claim arose.

**WHEREFORE**, Plaintiff requests the following relief:

A. A jury to be empaneled to try Plaintiff's claim for monetary relief;

B. Money judgment against Defendant Black for $352,666.20 plus post-judgment interest accrued up to the date of judgment in this action, NY DCL § 277(b)(1);

C. An injunction against further disposition by Defendants Black of any property transferred by EasyKnock, NY DCL § 276(a)(3)(i);

D. Avoidance of the transfers by EasyKnock to Defendant Black to the extent necessary to satisfy Plaintiff Stewart's Claim, NY DCL § 276(a)(1);

E. Attachment of real property transferred to Defendant Black or companies he controls to the extent necessary to satisfy Plaintiff Stewart's Claim, NY DCL § 276(a)(2);

F. Authorization of Plaintiff to levy execution on real property transferred to Defendant Black or companies he controls to the extent necessary to satisfy Plaintiff Stewart's Claim, NY DCL § 276(b);

G. An award of attorneys' fees and costs pursuant to NY DCL § 276-a and 73 P.S. § 201-9.2;

H. Such other relief deemed appropriate by the Court, NY DCL § 276(a)(3)(iii).

Dated: November 7, 2025

*[signature]*
Evan S. Rothfarb
Schlanger Law Group, LLP
60 East 42nd Street, 46th Floor
New York, NY 10165
T: 212-500-6114
F: 646-612-7996
E: erothfarb@consumerprotection.net

Irv Ackelsberg (*pro hac vice forthcoming*)
iackelsberg@langergrogan.com
David Nagdeman (*pro hac vice forthcoming*)
dnagdeman@langergrogan.com
LANGER GROGAN & DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Telephone: (215) 320-5660

Michael R. Froehlich (*pro hac vice forthcoming*)
mfroehlich@clsphila.org
COMMUNITY LEGAL SERVICES INC
1410 W. Erie Ave.
Philadelphia, PA 19140
Telephone: (215) 227-4733

*Attorneys for Michele Stewart*